UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES,

                              Plaintiff,

              – *against* –

ROBERT JEFFREY JOHNSON *also known as* JEFF JOHNSON, ROSS BALDWIN, and KATHLEEN HOOK,

                              Defendants.

**OPINION & ORDER**

21-cr-428 (ER)

RAMOS, D.J.:

    Defendants Robert Jeffrey Johnson, Kathleen Hook, and Ross Baldwin[1] were charged in a five-count indictment with two counts of conspiracy to commit wire fraud, two counts of wire fraud, and one count of providing false statements to law enforcement.[2]  Doc. 2.

    Before the Court are the parties' pretrial motions.  The Defendants jointly move to:  (1) suppress the search and seizure of their email records, Doc. 65; (2) dismiss Counts One through Four of the indictment, Docs. 66, 67; (3) sever, Doc. 72; (4) offer testimony of a witness located in France, Andre Cardoso, via live closed-circuit television during trial, or via deposition, Doc. 90; (5) and exclude any evidence of Johnson's prior conviction, Doc. 85.  The Defendants also move for an order requiring witnesses to comply with subpoenas *duces tecum*, Doc. 83, and Hook moves separately to suppress statements and documentary evidence, Doc. 64.  The

---

[1] Baldwin pleaded guilty to Counts One through Five of the indictment on January 25, 2023.  *See* Min. Entry dated January 25, 2023.  When the Court refers to "the Defendants" in this Opinion, it refers to Johnson and Hook.

[2] Counts One and Three allege that the Defendants engaged in a scheme to defraud investors, Doc. 2 ¶¶ 1–39, and Counts Two and Four allege that they engaged in a scheme to defraud insurers, *id.* ¶¶ 40–46.  On February 10, 2023, the Government informed the Court that it would not proceed to trial on Counts Two and Four of the indictment. Doc. 88

Government moves *in limine* to admit evidence of Johnson's prior conviction and preclude the cross-examination of a Government witness on particular subjects.  Doc. 89.

For the reasons set forth below, the Defendants' motion to dismiss Counts Two and Four of the indictment is dismissed as moot.  Furthermore, their motions to suppress evidence and to dismiss Counts One and Three of the indictment are DENIED; their motions for severance, and to offer the testimony of a foreign witness by alternative means are DENIED; and their motion to exclude Johnson's prior conviction is also DENIED.  The Court defers judgment on the Government's remaining motion *in limine* and the Defendants' motion for an order requiring compliance with their subpoenas *duces tecum*.

## I.     BACKGROUND

### A.  Offense Conduct[3]

The Government alleges that Johnson, along with his co-defendants Kathleen Hook[4] and Ross Baldwin, conspired to defraud investors in connection with a precious metals leasing program known as the "Silver Lease Program" between 2014 and January 2021.  Doc. 2 ¶¶ 1, 2.  An investor could participate in the Silver Lease Program in one of two ways:  he could either (1) pay funds to the operators of the Program in order to purchase silver that the investor then leased to the operators of the Program, in return for a fixed monthly dividend payment, or (2) provide silver that he already owned in order to lease that silver to the operators of the Program, in return for a fixed monthly dividend payment.  *Id.* ¶ 2.

According to the Government, the Defendants misled investors about the Silver Lease Program in a number of ways.  First, they represented to investors that they owned a particular

---

[3] The relevant facts are drawn from the indictment.  Doc. 2.

[4] Kathleen Hook is the mother-in-law of Johnson.  Doc. 65-1 ¶ 18.

quantity of silver that was securely stored by Precious Commodities Inc.[5] ("PCI") in a locked storage facility in Florida; however, in truth, PCI did not have storage units at the Florida facility. *Id.* ¶ 3. Additionally, investors provided millions of dollars to purchase silver through the Program, *id.* ¶ 4, but a large portion of the funds were misappropriated by the Defendants for personal expenses and to fund other unrelated business ventures, *id.*

In the spring of 2019, PCI stopped making monthly dividend payments to a majority of Program investors. *Id.* ¶ 5. Many investors made repeated demands for the return of their money or silver, to no avail. *Id.* The Government alleges that approximately 60 investors were defrauded of at least approximately $8 million as a result of the scheme. *Id.* ¶ 6.

### B.  Roles

The indictment states that Johnson[6] "orchestrated the Silver Lease Program scheme to defraud [investors]" as described in the indictment, including by installing associates and family members as officers of PCI and an entity called NCB Wholesale Co. ("NCBW"), and by providing direction to these individuals regarding the operation of the Silver Lease Program. *Id.* ¶ 7.

Hook was affiliated with NCB Wholesale. Through that entity, silver was secured from investors on behalf of the Silver Lease Program. *Id.* ¶ 9. Hook participated in the day-to-day operations of the Program, and she was also the signatory on the bank accounts of NCB

---

[5] According to the Government, "PCI acted as a purported 'silver depository' in connection with the Silver Lease Program. PCI entered into agreements with investors under which investors agreed to lease the silver that they owned to PCI in return for monthly dividend payment from PCI. Investors in the Silver lease program were told that their silver would be stored by PCI at the Florida Storage Facility in a secured, locked unit, and that their silver would be stored on a segregated basis and not mixed with the silver belonging to other investors." Doc. 2 ¶ 10.

[6] As relevant here, Johnson previously pleaded guilty to several, separate federal charges in the Southern District of Ohio stemming from a single indictment. Doc. 96 at 2. Specifically, Johnson was convicted of: bank fraud; destruction, alteration, or falsification of records in federal investigations and bankruptcy; and willful failure to collect or pay taxes on September 27, 2012. Doc. 89-2 (change-of-plea transcript); Doc. 89 at 14. The charges related to Johnson's management of an Ohio-based construction company. Doc. 89 at 13.

Wholesale. *Id.* She directly diverted investments to, among other things, fund unrelated business ventures and pay for her own personal expenses, as well as the personal expenses of Johnson and his wife Carrie Johnson, Hook's daughter. *Id.*

Baldwin owned and operated the entity National Coin Broker, Inc. ("NCB"), and directly solicited potential investors in the Silver Lease Program. *Id.* ¶ 8. According to the Government, Baldwin "established and maintained websites where he directed potential investors that described the Silver Lease Program." *Id.* ¶ 11. Baldwin also solicited investors by telephone and in-person, including at trade shows. *Id.* According to the Government, Baldwin made numerous material misrepresentations to induce investors to participate in the program. *Id.*

### C.  Law Enforcement Searches & Seizures

As relevant here, law enforcement officers searched and seized evidence related to the Silver Lease Program pursuant to two sets of search warrants:  (1) a Florida state court warrant permitting the Fort Lauderdale Police Department to search a U.S. Postal Service Priority Mail shipping box addressed to "Precious Commodities," Doc. 64-1; and (2) federal warrants permitting the Federal Bureau of Investigation ("FBI") to obtain and search the records[7] of the email account jefjohnsn@aol.com ("Johnson email address") and khook1061@gmail.com ("Hook email address"), among other email addresses, Doc. 65-2; *see also* Doc. 65-1.

### *i.*  State Court Warrant

In support of the application for the state court warrant, Fort Lauderdale Police Department ("FLPD") detective Jesse Gossman stated that Precious Commodities was involved in an organized scheme to defraud the public, and the shipping box to be searched contained two

---

[7] The records outlined in the warrants included email content, address book information, subscriber and payment information, transactional records, customer correspondence, and preserved or backup records.  Doc. 65-2 at 9–10.

weeks-worth of mail intended for it.  Doc. 64-1 at 2–3.  Det. Gossman identified two victims as well as the individuals who had provided information about the contents of the shipping box.  *Id.* Specifically, Det. Gossman stated that after serving a subpoena on Carr Workplaces, a virtual office space provider, the police obtained records showing that Precious Commodities had listed a specific address, 420 Lincoln Road, Suite 402, Miami Beach, for mail forwarding.  *Id.* at 2. The general manager of Carr Workplaces advised that Precious Commodities was behind on rent and had not come by to pick up its mail, so she placed the mail in a USPS box and sent it to the Miami Beach address.  *Id.*

Det. Gossman then went to the Miami Beach address, accompanied by another FLPD officer, on November 14, 2019, observed that the address belonged to "American Construction and Engineering," and saw a business card for Carrie Johnson, Johnson's wife.  *Id.* at 3.  At that point, the officers entered the building and encountered Kathleen Hook.  *Id.*  The officers spoke with Hook,[8] who confirmed that the Johnsons maintained offices at the address and consented to turning the shipping box—which was stored beneath her desk—over to the FLPD.  *Id.*  During the questioning, Hook stated, in substance and in part, that she did not work for PCI and had only been involved in preparing its taxes, and she also allowed the officers to view and take a number of PCI's tax documents.  *Id.*; *see also* Doc. 76 at 35.  Hook further told the police that she was unsure why the shipping box had been forwarded to her.[9]  Doc. 64-1 at 3.

---

[8] The police spoke with Hook for approximately one hour.  Doc. 64 at 14; Doc. 76 at 45.  During that time, the police stated to Hook that PCI records were "evidence" in a case that they were investigating, and they told Hook that they could seek a subpoena to produce the documents.  Doc. 64 at 11–12; Doc. 76 at 45.  They further stated that if the records "disappear[ed], [she would] be charged with concealing evidence."  Doc. 64 at 12.  Det. Gossman also stated that he "didn't just stumble through this door and know about all these different entities and people involved[,] so there's a lot more I know about that I'm not discussing right now."  Doc. 64 at 11.  The officers were in uniform, and their firearms were visible throughout this interaction.  Doc. 64 at 14; Doc. 76 at 44.

[9] The parties have not provided the Court with a transcript or the specific statements made by Hook during her conversations with the FLPD beyond what is indicated here.  *See* Doc. 64 at 11–12; Doc. 64-1 at 3; Doc. 76 at 35.

The court issued the warrant allowing the FLPD to search the shipping box.  *Id.* at 5–6.

### ii.  Federal Warrants

In support of the application for the federal warrants, FBI Special Agent Julie Amato submitted a written affidavit providing background regarding the Silver Lease Program and the Defendants' participation therein on May 26, 2020.  Doc. 65-1 ¶¶ 1–83; *id.* at 50.   She indicated that customers of the Program were told that the silver they leased to PCI was fully insured, and that it was stored in a "vault" in the Florida storage facility, referred to as the "Fort Lauderdale RoboVault Facility."  *Id.* ¶¶ 23, 24.   During the course of her investigation, however, Agent Amato learned that these representations were false; after reviewing records from the Florida storage facility, it became clear that the silver was not being stored there, and that the facility did not "have any vaults" that corresponded with the representations that had been made to investors. *Id.* ¶¶ 24, 25(a).  Although family members of Johnson's rented several storage units in the facility during periods between 2013 and 2018, Agent Amato's investigation revealed that "these units were far too small to accommodate even remotely close to the full quantity of silver that customers were purportedly leasing to PCI in connection with the Silver Lease Program."  *Id.* ¶ 25(c).  Notably, neither Johnson nor others rented *any* storage units "during the time period when customers were entering into Silver Lease Program agreements in which they were informed their purported silver was being stored in a specific unit at the Fort Lauderdale RoboVault Facility."  *Id.* ¶ 26(g).

In regard to insurance coverage, Agent Amato indicated that Johnson, Baldwin, and others applied for and obtained insurance policies for the silver "based on false representations." *Id.* ¶ 30.  Among other things, the applications represented that the precious metals that PCI sought to insure were being stored at the Florida storage facility.  *Id.* ¶¶ 31(e), 33.

Agent Amato went on to provide context about the Silver Lease Program's failure to issue dividend payments. *Id.* ¶ 39. She indicated that in the first and second quarters of 2019, multiple customers of the Program did not receive their monthly payments. *Id.* ¶ 39(a). While many of those customers demanded the return of their silver, they were unable to reach anyone at PCI or otherwise recover their silver.[10] *Id.*

Agent Amato also described the nature of the email communications in the email accounts to be searched pursuant to the warrant. *Id.* ¶¶ 40–75. Specifically, she stated that based on her investigation, accounts including "jefjohnson@aol.com" were used to conduct business on behalf of Precious Commodities and NCBW, one of the three companies utilized through the Silver Lease Program. *Id.* ¶¶ 13, 41–47, 50. Agent Amato further indicated that Johnson used that email address to send correspondence related to Silver Lease Program agreements. *Id.* ¶ 52. In regard to Hook's Gmail account, "khook1061@gmail.com," Amato stated that Hook used the account in connection with the Silver Lease Program scheme, including in interacting with Johnson and others. *Id.* ¶ 67. She added that the address was listed as the registrant email address for two PCI websites, namely, preciouscommoditiesinc.com and pcidepository.com. *Id.* ¶¶ 18, 19, 67, 68. Additionally, Agent Amato noted that Hook used the account to request that mail be forwarded to the Miami Beach address. *Id.* ¶ 69. Amato concluded that "[b]ased on the foregoing emails sent and/or received by the Subject Accounts, there is probable cause to believe that the Subject Accounts will contain evidence, fruits, and instrumentalities of the Subject Offenses." *Id.* ¶ 73; *see also id.* ¶¶ 76, 77.

---

[10] This was true as of the date when these customers were interviewed by law enforcement in or about 2019 and 2020. Doc. 65-1 ¶ 39(a).

The Court issued the search warrants directing the email providers to provide the FBI with records related to the email addresses.[11]  Doc. 65-2 at 1–2 (directing Google LLC to provide records) ("Google warrant"); *id.* at 7–11 (directing Oath Inc. to provide records) ("Oath Inc. warrant").  Attachments to the warrants directed the providers to turn over all emails sent from the listed addresses, address book information, subscriber and payment information, transactional records, customer correspondence, and preserved or backup records.  *Id.* at 3–4, 9–10.

The warrants permitted law enforcement personnel to review the records to locate "any evidence, fruits, and instrumentalities of a scheme to defraud customers of the Silver Lease Program and insurers in violation of 18 U.S.C. §§ 1343, 1349, and 2 (the 'Subject Offenses')[.]."  Doc. 65-1 ¶ 78; Doc. 65-2 at 4.  They specified that law enforcement could review:  evidence of criminal conduct; communications constituting crime; evidence of control over corporate entities used in connection with the Silver Lease Program scheme, or which received proceeds of the scheme; communications identifying victims, loss, and disposition of proceeds; evidence relating to state of mind; identities and locations of co-conspirators and victim; geographic data; location of other evidence; and information pointing to the location of other evidence.  Doc. 65-1 ¶¶ 76–77; Doc. 65-2 at 5–6.  In conducting its review, the Government was authorized to undertake "a cursory inspection of all emails within the Subject Accounts" and conduct "keyword searches."  Doc. 65-1 ¶ 79.

---

[11] The warrants did not provide temporal limitations for the production of records related to the Johnson and Hook email addresses; however, they did provide temporal limitations for at least one other account.  Doc. 65-2 at 3–4 (limiting production with respect to the email account bdeforest@gmail.com to items created between January 1, 2013, and December 31, 2017).

### D.  Pretrial Proceedings

The Government filed the original, sealed indictment on June 28, 2021.  Docs. 1, 2.

Magistrate Judge Debra C. Freeman subsequently issued arrest warrants for the three Defendants

on July 1, 2021.  Docs. 4, 5, 6.  They were arrested on July 1, 2021, and were subsequently

arraigned on July 7, July 12, and July 14, 2021.  Min. Entry dated July 12, 2021; Docs. 14, 18.

The Court thereafter held several pretrial conferences.  *See* Min. Entries dated Feb. 24, 2022;

July 14, 2022.

As noted above, Defendant Ross Baldwin pleaded guilty to Counts One through Five on

January 25, 2023.  Min. Entry dated Jan. 25, 2023.  The parties filed the pending pretrial motions

between December 2022 and March 2023.  *See* Docs. 64–67, 72, 82, 85, 90, 100.

As relevant here, in December 2022, the Government submitted a Mutual Legal

Assistance Treaty request for assistance to France, requesting that France permit it to participate

in an interview of Andre Cardoso, a French national who is a potential witness in this case.  Doc.

95 at 7.  French authorities declined to allow counsel to participate; however, they provided the

Government with a report of their own interview with Cardoso, which took place on January 19,

2023.  *Id.*  The Government provided defense counsel with the original report of the interview in

French as well as a certified translation.[12]  *Id.*  As relevant to the motions before the Court,

defense counsel has indicated that Cardoso would state the following if permitted to testify:

---

[12] Additionally, the Government provided information regarding the possibility of receiving testimony from
Cardoso.  Doc. 95 at 8–9.  Specifically, it indicated that the Office of International Affairs ("OIA") of the United
States Department of Justice advised that "the taking of video testimony from a resident of France would require the
consent and assistance of the government of France."  *Id.* at 8.  "[T]o depose Cardoso in France, the defendants
would have to prepare a letters rogatory package for this Court to transmit to the U.S. State Department, which
would send the request to France, and all parties would have to await an answer from France.  [ . . . ] According to
the State Department, execution of letters rogatory could take over a year."  *Id.* at 9.  Additionally, "[w]ith respect to
trial testimony by video[,] OIA personnel have informed Government counsel that they are not aware of any
occasion in which a French resident testified remotely in a United States federal criminal trial."  *Id.* at 9.  This
process would also require a request through letters rogatory to the government of France.  *Id.*

(1) As an officer of PCI,[13] he did not believe that the PCI Agreements prohibited disbursements to fund unrelated business ventures, including the personal expenses of Johnson, Hook, and Johnson's wife;

(2) He approved disbursements of lender funds for unrelated business ventures;

(3) He intended to repay PCI lenders with anticipated profits and revenues from the unrelated business ventures.

Doc. 90 at 10–11.

## II.   DISCUSSION

### A.  Suppression

Hook moves to suppress her statements to the FLPD as well as documentary evidence seized from her office by law enforcement on November 14, 2019.  Doc. 64 at 1.  Both Defendants move to suppress all evidence seized pursuant to the search warrants for Johnson's AOL email account and Hook's Gmail account.  Doc. 65 at 1.  The Court takes the arguments in turn.

#### i.  Legal Standard

The Fourth Amendment protects against searches unsupported by probable cause by mandating that a search warrant describe with particularity the place to be searched and the persons or things to be seized.[14]  *United States v. Rosa*, 626 F.3d 56, 61 (2d Cir. 2010).  Probable

---

[13] Cardoso served as President of PCI.  Doc. 90 at 14; Doc. 95 at 15 n.2.  While the Defendants contend that Cardoso served in this role as of April 24, 2016, Doc. 90 at 14, the Government argues that this appears to be an error, given that "the earliest filing . . . reflecting that Cardoso was President of PCI" is dated April 24, 2017, Doc. 95 at 15 n.2.

[14] The Second Circuit has articulated three requirements a warrant must meet for it to be considered sufficiently particular:  "First, a warrant must identify the specific offense for which the police have established probable cause.  Second, a warrant must describe the place to be searched.  Third, the warrant must specify the items to be seized by their relation to designated crimes."  *United States v. Galpin*, 720 F.3d 436, 445–46 (2d Cir. 2013) (internal citations and quotations omitted).  Essentially, "the warrant must enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize."  *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992).  In the context of a digital search, the Second Circuit has counseled that courts should express "a heightened sensitivity to the particularity requirement."  *Galpin*, 720 F.3d at 447; *see also United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, at *6 (S.D.N.Y. Oct. 9, 2020).

cause is a "flexible, common-sense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983). "[O]nly the probability, and not a *prima facie* showing, of criminal activity is the standard of probable cause." *Spinelli v. United States*, 393 U.S. 410, 419 (1969), *abrogated on other grounds by Illinois v. Gates*, 462 U.S. 213 (1983). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

As relevant here, "a defendant's Fourth Amendment rights are violated only when the challenged conduct invades *his* legitimate expectation of privacy rather than that of a third party." *United States v. Santillan*, 902 F.3d 49, 62 (2d Cir. 2018) (emphasis in original) (internal quotation marks and citation omitted). A defendant seeking to suppress evidence based on an alleged Fourth Amendment violation "must show that he had a reasonable expectation of privacy in the place or object searched." *Id.* (quoting *United States v. Delva*, 858 F.3d 135, 148 (2d Cir. 2017)). The defendant must submit sworn evidence, in the form of an affidavit or testimony, from the defendant or someone with personal knowledge, "demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search." *United States v. Ruggiero*, 824 F. Supp. 379, 391 (S.D.N.Y. 1993), *aff'd*, 44 F.3d 1102 (1995) (citations omitted). Absent this demonstration, the defendant lacks standing to challenge the search. The duty of the reviewing court "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Gates*, 462 U.S. at 238–39 (citing *Jones v. United States*, 362 U.S. 257, 271 (1960)) (internal quotation marks omitted). "A

11

reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993).

Additionally, and as relevant to the pending motions, the Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In the seminal case *Miranda v. Arizona*, the Supreme Court held that police cannot interrogate a suspect in custody without first warning the person "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires," known as a person's *Miranda* rights.  384 U.S. 436, 479 (1966).  These warning requirements "apply only to 'custodial interrogation[s].'" *United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004) (quoting *Miranda*, 384 U.S. at 444). The Second Circuit has held that "[t]he test for custody is an objective one:  whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest."  *Id.* at 671 (internal quotation marks and citation omitted).  Further, "interrogation" under *Miranda* does not only refer to express questioning, but also to "'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"  *United States v. Stroman*, 420 F. App'x 100, 102 (2d Cir. 2011) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

On a motion to suppress statements, the defendant bears the burden of showing that he was subject to custodial interrogation.  *United States v. Pena*, 961 F.2d 333, 336 (2d Cir. 1992) ("The defendant seeking suppression bears the burden upon [the] issue.").  A "spontaneous utterance" from a defendant in custody prior to being *Mirandized* is admissible if it is "given

freely and voluntarily without any compelling influence" and is "not the result of police interrogation." *United States v. Compton*, 428 F.2d 18, 22 (2d Cir. 1970).

### ii. Suppression of Shipping Box Records and Hook Statements

Hook argues that Det. Gossman violated her Fourth and Fifth Amendment rights when he entered the American Construction office,[15] seized the shipping box addressed to Precious Commodities, and "interrogated" her without first providing *Miranda* warnings.  Doc. 64 at 2–3. In response, the Government argues that:  Hook lacks standing to assert unlawful entry into the office, Doc. 76 at 41; the officers lawfully recovered the shipping box, *id.* at 41–42; Hook's statements were not the result of an unlawful search of the American Construction office or seizure of the package, *id.* at 42; and Hook was not in custody when she made statements to law enforcement, *id.* at 43–46.[16]

Hook's motion is denied.  As a preliminary matter, the Court concludes that Hook lacks standing to assert unlawful entry into the offices of American Construction.  As the Government emphasizes, Hook "cannot demonstrate any expectation of privacy, let alone a legitimate one, in American Construction's office space other than her own."  *Id.* at 41.  That is because "an employee of a corporation . . . does not, simply by virtue of [her] status as such, acquire Fourth Amendment standing with respect to company premises."  *United States v. SDI Future Health,*

---

[15] As relevant here, Hook argues that the office is not open to the public, and she did not invite the FLPD officers into the office.  Doc. 64 at 7.

[16] In its opposition, the Government also contends that Hook's request for a hearing on these questions must be denied because she "has offered no affidavit asserting any facts, and instead has relied entirely on the affidavit of [one of] the officer[s] who interviewed her."  Doc. 76 at 40.  It underscores that there is no dispute about the material facts regarding Hook's conversation with the police, and Hook "appears to accept the facts regarding the FLPD officer's entry, questioning, and receipt of the Package as alleged in the FLPD affidavit in support of their application for a warrant to search the Package."  *Id.* at 40.

After the Government filed its opposition, Hook attached a sworn declaration regarding her interactions with the FLPD to the Defendants' reply brief.  *See* Doc. 84-2.  Hook's affidavit restated facts pertaining to her interview with the FLPD as they were laid out in her opening brief.  *Compare* Doc. 84-2 *with* Doc. 64 at 11–14.

*Inc.*, 568 F.3d 684, 696 (9th Cir. 2009); *see also United States v. Nagle*, 803 F.3d 167, 178 (3d Cir. 2015) ("These decisions all support a common proposition:  a shareholder may not challenge a search of a corporate property merely because he is a shareholder, but he may challenge the search if he 'showed some personal connection to the places searched and the materials seized,' *SDI Future Health*, 568 F.3d at 698, and protected those places or materials from outside intrusion."); *Lagow v. United States*, 159 F.2d 245, 246 (2d Cir. 1946) (per curiam) (concluding that the sole shareholder and officer of a corporation could not "take on the privilege of the corporation under the Fourth Amendment . . . [because] its immunity is not his immunity.").  In other words, although Hook may have had an expectation of privacy in certain portions or spaces within the American Construction office, she cannot assert that her rights were violated by the officer's warrantless entry into the space as a whole.  *See Mancusi v. DeForte*, 392 U.S. 364, 368–69 (1968) (noting that "[i]t has long been settled that one has standing to object to a search of his office, as well as of his home," but the reasonable expectation of privacy is limited to the individual's "private" office).  That Hook had a key to the office suite and the suite had "one entrance/exit to which no one other than invitees could access after they were screened by building security personnel," does not change the analysis here.  Doc. 84 at 28.

Nor did the police unlawfully search Hook's personal office to seize the shipping box. *See* Doc. 64 at 2, 8 ("Further, the seizure of documents from Ms. Hook's office without a warrant was likewise in violation of the Fourth Amendment.").  As the Government underscores, the FLPD "did not conduct a search of Hook's office."  Doc. 76 at 41.  In fact, Hook provided the officers with the shipping box voluntarily.  Doc. 64-1 at 3, 4.  The affidavit sworn to by Det. Gossman stated that he "inquired about the package to Precious Commodities that had previously been delivered," and Hook then "pointed to the floor and said it was still sitting

beneath her desk unopened." *Id.* at 3.  Hook then "stated that she did not work for Precious Commodities but had only been involved in doing their taxes," and that she was "unsure why the package was forwarded to her." *Id.*  She then "consented to turning the package over to [Detective Gossman] on behalf of the Fort Lauderdale Police Department." *Id.*  Under these circumstances, the Court cannot conclude that the FLPD unlawfully searched and seized the shipping box.

Finally, the Court denies Hook's motion to suppress her statements.  Doc. 64 at 8–15.  First, for the reasons set forth above, the statements were not the fruit of an unlawful search of either the American Construction suite or Hook's individual office.  Additionally, the statements were not taken in violation of Hook's Fifth Amendment rights as set out by *Miranda* and its progeny.  *See Miranda*, 384 U.S. at 436.

Hook contends that she "was interrogated for over an hour by two uniformed law enforcement officers bearing firearms in a private setting, outside of public view," and thus was "in custody" for the purposes of the Fifth Amendment, and that the officers "initiated the interrogation with investigative intent and knowledge that Ms. Hook might reveal information." Doc. 64 at 10.  Accordingly, Hook argues, the officers' failure to inform her of her *Miranda* rights was a violation of her privilege against self-incrimination, and her statements should thus be suppressed.  *Id.*  The Government disputes Hook's account.  It argues that she "cannot carry her burden of proving that she was in custody for *Miranda* purposes while Det. Gossman interviewed her in her office" because she was not arrested, told that she would be arrested, or otherwise restrained in any way.  Doc. 76 at 43–44.  In other words, because Hook was not in custody and could have refused to answer the FLPD's questions, she was not subjected to a custodial interrogation.  *Id.*

15

Here, as the Government noted, Hook cannot "carry her burden of proving she was in custody" when she spoke with the FLPD. *Id.* at 43.  The Second Circuit has made clear that the "ultimate" inquiry for determining *Miranda* custody is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Newton*, 369 F.3d at 670 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (internal quotation marks omitted); *see also Stansbury v. California*, 511 U.S. 318, 322 (1994) (concluding that the ultimate inquiry is "simply whether there was a formal arrest or restraint on freedom of movement to the degree associated with a formal arrest").  But in the instant case, the Court cannot conclude that Hook was "subjected to the restraints comparable to those associated with a formal arrest." *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 2004) (citations omitted).

To be sure, the officers that questioned Hook were armed, spoke to her in the office suite for approximately one hour, and otherwise made a number of comments suggesting that they were investigating a matter that involved her—including that they might seek to subpoena her. Doc. 64 at 11–12; Doc. 76 at 44–45.  However, those circumstances did not *restrain* Hook, nor did they reasonably suggest that she was under "formal arrest." *Newton*, 369 F.3d at 675.  In fact, as the Government underscores, the officers' indication that they "could or would leave to obtain a subpoena made clear that the officers never intended to place Hook under arrest, otherwise, there would be no one [upon whom] to serve the subpoena." Doc. 76 at 45.  And the officers never suggested that Hook had an obligation to continue the conversation with them— nor did Hook ask whether she was free to leave or end the conversation.   Under these circumstances, the Court cannot conclude that Hook was in custody at the time that she spoke with the FLPD officers.

For all of these reasons, Hook's motion to suppress her statements and the package is denied.

### iii. Suppression of Email Records

Johnson and Hook jointly move to suppress all evidence obtained pursuant to the warrant for their email accounts. *See* Doc. 65. In support of the application, the Defendants argue that the warrants were excessively broad, permitting the government to "seize and search *all* emails, email drafts, contacts, subscriber, payment information transactional records, customer correspondence, and backup records," and otherwise lacked particularity. *Id.* at 2, 11, 13–15.

In response, the Government emphasizes that "in the suppression context, courts have almost uniformly upheld the Government's ability to obtain the entire contents of the email account to determine which particular emails come within the search warrant." Doc. 76 at 25 (citing *In re A Warrant for All Content & Other Info. Associated with the Email Account xxxxxxx@gmail.com Maintained at Premises Controlled by Google, Inc.*, 33 F. Supp. 3d 386, 394 (S.D.N.Y. Aug. 7, 2014) (collecting cases)). Accordingly, it contends, "it was proper for investigators to search [the email] accounts for evidence of the Subject Offenses."[17] *Id.* (citing *United States v. Bowen*, 689 F. Supp. 2d 675, 682 (S.D.N.Y. 2010) (concluding that it is not necessary for law enforcement to "ascertain which e-mails are relevant before copies are obtained from the internet service provider for subsequent searching.")). The Government also argues that the warrants were not overbroad from a temporal perspective, given the "breadth,

---

[17] The Government adds the following context in a footnote:

> As a practical matter, the Government must search an entire email account to obtain evidence of the specified subject offenses, as service providers such as Google and AOL do not conduct their own searches of email accounts prior to turning over the contents of the accounts to the Government pursuant to a judicially authorized search warrant.

Doc. 76 at 25 n.3.

complexity, and long-running nature of the fraud described in the Special Agent's Affidavit[.]" *Id.* at 26.  With regard to particularity, the Government asserts that the categories of emails to be searched pursuant to the warrants "relat[ed] directly to the Silver Lease Program fraud and the scheme to defraud insurers." *Id.* at 28; *see also id.* at 29–31.  Finally, the Government states that even if the search warrants were "overbroad or lacking in particularity," evidence obtained pursuant to their directives "should not be suppressed because the law enforcement agents who executed the search warrants reasonably relied on them in good faith." *Id.* at 32.

As noted above, the Fourth Amendment makes clear that "no warrants shall issue, but upon probable cause, supported by Oath." U.S. Const. amend. IV; *see also United States v. Rosa*, 626 F.3d at 61 ("Thus, the Fourth Amendment protects against 'wide-ranging exploratory searches' unsupported by probable cause, *Maryland v. Garrison*, 480 U.S. 79, 84 (1987), by mandating that a search warrant describe with particularity the place to be searched and the persons or things to be seized.").   Probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts[.]" *Gates*, 462 U.S. at 232.  Accordingly, courts must "resolve any doubt about the existence of probable cause in favor of upholding the warrant." *Unites States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998).  The *Leon* good faith exception provides that the exclusionary rule does not apply to evidence "obtained in objectively reasonable reliance on a subsequently invalidated search warrant[.]"[18] *United States v. Leon*, 468 U.S. 897, 922 (1984); *see also United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008).

---

[18] The Second Circuit has noted that "there are four circumstances in which the good-faith exception does not apply: '(1) where the issuing [judge] has been knowingly misled; (2) where the issuing [judge] wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient [such as by failing to particularize the place to be searched or the things to be seized] that reliance upon it is unreasonable.'" *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992)) (alterations in original).

The Court concludes that the warrants were properly supported by probable cause and were otherwise sufficiently narrow and particular.  Accordingly, Defendants' motion is denied.

As a preliminary matter, the Court underscores the significant, detailed information outlined in Agent Amato's affidavit supporting probable cause in this case.  *See generally* Doc. 65-1 ¶¶ 8–75.  The affidavit described in detail the criminal conduct carried out by the Defendants in furtherance of the conspiracy between 2009 and 2020.  *See, e.g.*, *id.* ¶¶ 13, 16, 18, 26, 30.  Notably, Agent Amato's sources included, among other things:  customers of the Silver Lease Program, *id.* ¶ 11, corporate filings for the companies used to carry out the scheme, *id.* ¶ 13, customer-facing websites, *id.* ¶¶ 14, 19, 20, promotional brochures, *id.* ¶ 21, agreements, *id.* ¶ 22, records from the Florida storage facility, *id.* ¶ 26, email communications, *id.* ¶ 30, insurance applications, *id.* ¶ 31, 33, 35, 39, and other records, *see generally id.* at 8–75.  The Defendants' attempts to reduce the scope of the affidavit to "14 [email] exchanges ranging from June 24, 2014 through August 6, 2018," are thus unavailing here, particularly given the breadth of the information laid out by Agent Amato.  Doc. 65 at 15 (Defendants outlining several aspects of Agent Amato's affidavit in their joint motion to suppress).  As the Government notes, "the Affidavit . . . described a complex fraudulent scheme involving multiple individuals and corporate entities that spanned many years," and otherwise made clear that "NCB—the entity that Baldwin was using in connection with the fraud—was incorporated as early as 2009[.]" Doc. 76 at 26.

Additionally, and critically here, the warrants contained a detailed list of the particular types of information to be produced by the account providers, Doc. 65-2 at 3–4 9–10, and they provided law enforcement with a distinct list of records that could be reviewed once those records were provided, Doc. 65-2 at 4–5, 10–11.  And the warrants drew a connection between

each type of record to be reviewed and the Silver Lease program.  Doc. 65-2 at 4–6, 10–11.  For example, where the warrant allowed law enforcement to review "[e]vidence of criminal conduct," it specified that such evidence could include "communications reflecting an agreement between the users of the Subject Accounts, and other co-conspirators to engage in the scheme to defraud customers of the Silver Lease Program scheme, as well as insurers[.]"  Doc. 65-2 at 5, 10.  In other words, the warrants did not permit a "general search" of the email records; rather, they provided a tailored list describing the types of records that could be reviewed along with their relationship to the criminal conduct at issue.  Doc. 65-2 at 5–6, 10–11; *see also Rosa*, 626 F.3d at 62 (discussing the particularity requirement and indicating that search warrants require "specificity to allow for a tailored search of [] electronic media").

Given these circumstances, the Court cannot conclude that the federal warrants lacked probable cause or were otherwise overbroad or insufficiently particular.  The motion to suppress the evidence obtained pursuant to those warrants is thus denied.  Doc. 65.

### B.  Dismissal

The Defendants moved to dismiss Counts One through Four of the indictment.  Docs. 66, 67.  However, in a letter dated February 10, 2023, the Government informed the Court that it would not proceed to trial on Counts Two and Four.  Doc. 88 at 1.  Accordingly, the Court here considers the motion as to Counts One and Three, Doc. 66, and it dismisses the motion as to Counts Two and Four as moot, Doc. 67.

### *i.*  Legal Standard

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Hamling*

20

*v. United States*, 418 U.S. 87, 117 (1974); Fed. R. Crim. P. 7(c)(1).  To state an offense, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (citation and internal quotation marks omitted).

The sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.  *Id.* at 777; *see also United States v. Doe*, 63 F.3d 121, 125 (2d Cir. 1995) ("A defendant is only entitled to raise in pretrial motions a 'defense, objection, or request which is capable of determination without the trial of the general issue.' The general issue in a criminal trial is, of course, whether the defendant is guilty of the offense charged.") (quoting Fed. R. Crim. P. 12(b)).  As such, "the dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights."  *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted); *United States v. Gatto*, 295 F. Supp. 3d 336, 341 (S.D.N.Y. 2018) (denying motion to dismiss indictment charging conspiracy to commit wire fraud where it "track[ed] the language of [the federal wire fraud statute]," and opining that "extensive factual allegations as to when, how and with whom the alleged scheme was undertaken . . . [were] more than sufficient to inform defendants of the particulars of the alleged conspiracy in which they are charged with having participated").

When considering a motion to dismiss an indictment, the Court "considers all allegations in the indictment to be true and does not consider any contrary assertions of fact by the defendant."  *United States v. Almaleh*, No. 17 Cr. 25 (ER), 2022 WL 602069, at *2 (S.D.N.Y. Feb. 28, 2022) (citations omitted); *see also United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir. 1998) (opining that a court focuses on the legal sufficiency of the indictment itself, without ruling on the legal sufficiency of the evidence).  Therefore, "[a] defendant challenging the

sufficiency of an indictment on a motion to dismiss faces a high hurdle." *United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *2 (S.D.N.Y. Dec. 11, 2017).

Counts One and Three are brought pursuant to 18 U.S.C. §§ 1343 and 2.  Title 18 of the United States Code, § 1343 states, in part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

*Id.*; *see also* 18 U.S.C. § 2 ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.").

The elements of wire fraud are (1) a scheme to defraud (2) to get money or property (3) furthered by the use of interstate wires.  *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000).  As relevant here, the Supreme Court recently held that the money or property requirement cannot be proven through allegations that a victim was denied the right to control his assets, known as the "right to control" theory.  *Ciminelli v. United States*, 143 S.Ct. 1121, 1127–1128 (2023).

### *ii.*  **Dismissal of Counts One and Three**

Counts One and Three of the indictment allege wire fraud conspiracy and wire fraud, respectively, with regard to the Silver Lease Program scheme.  Doc. 2 ¶¶ 1–39; 43–44.  The Defendants move to dismiss these counts "because they are based on a flawed theory of prosecution" that fails to sufficiently consider the terms of the Silver Lease Program Agreements

and also "fail to adequately allege the charged offenses[.]"[19]  Doc. 66 at 1, 6–20.  Specifically,

they contend that the allegations regarding the Silver Lease Program contradict the Program

Agreements, Doc. 66 at 12–15, insufficiently allege fraudulent intent, *id.* at 15–19, and are

improperly brought pursuant to the "right to control" theory, *id.* at 19–20.

The Government counters that the indictment "tracks the relevant statutory language for

each count," sets out the "essential elements of each offense," and otherwise provides "numerous

examples of the defendants' criminal affairs in action, with reference to particular dates,

statements, representations, and documents."  Doc. 76 at 14.  It also contends that Defendants'

arguments here "are nothing more than a request for summary judgment upon the Indictment, a

form of relief not available to the defendants."  *Id.* at 15 (citing *United States v. Dawkins*, 999

F.3d 767, 780 (2d Cir. 2021) ("But at the indictment stage, we do not evaluate the adequacy of

the facts to satisfy the elements of the charged offense.  That is something we do after trial.

Otherwise, we would effectively be asking district courts to engage in summary judgment

proceedings—something that does not exist in federal criminal procedure.") (internal quotation

marks, brackets, and citations omitted).  Finally, in regard to Defendants' "right to control"

theory arguments, the Government emphasizes that "the [D]efendants are charged *both* with

---

[19] In the alternative, Defendants move to strike from the indictment Baldwin's misrepresentations—which are asserted as part of the solicitation of investors—and requests that the Court postpone ruling on the motion and conduct a pretrial jury charge conference.  Doc. 66 at 13 n.5.  Rule 7(d) of the Federal Rules of Criminal Procedure permits courts to "strike surplusage from the indictment;" however, "it has long been the policy of courts within the Southern District to refrain from tampering with indictments," *United States v. Tomero*, 496 F. Supp. 2d 253, 255 (S.D.N.Y. 2007) (quoting *United States v. Bin Laden*, 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000)).  Such motions are "granted only" where the challenged allegations are irrelevant, inflammatory, or prejudicial.  *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (citation omitted).  Additionally, as the Government notes, courts in this district routinely defer ruling on a motion to strike until the presentation of the Government's evidence at trial.  Doc. 76 at 55 (citing *United States v. Mostafa*, 965 F. Supp. 2d 451, 467 (S.D.N.Y. 2013)) (additional citation omitted).  The Court defers ruling on this request until the conclusion of the trial, when the parties may address whether the Court should provide the jury with the indictment, and, if so, whether portions of the indictment should be stricken.  At this juncture, the request is premature.  *See, e.g.*, *United States v. Tuzman*, 301 F. Supp. 3d 430, 453–454 (S.D.N.Y. 2017); *United States v. Butler*, 351 F. Supp. 2d 121, 124 (S.D.N.Y. 2004).

defrauding their victims of their right to control their property *and with traditional property deprivations, including of the victims' money and assets*." Doc. 76 at 18 (emphasis added). Accordingly, it argues, the indictment continues to validly charge wire fraud and conspiracy, and the motion should be denied. *Id.*

The motion to dismiss Counts One and Three of the indictment is denied. At this stage, the Government has sufficiently set out its wire fraud conspiracy and wire fraud allegations. *See* Doc. 2 ¶¶ 1–39; 43–44. The allegations properly inform the Defendants of the charges against them and permit them to plead an acquittal or conviction in bar of future prosecutions for the same offense. *See Hamling*, 418 U.S. at 117. Additionally, although the Supreme Court recently concluded that the "right to control" theory cannot serve as the basis for a prosecution for federal wire fraud conspiracy and wire fraud charges, the indictment sufficiently asserts "a traditional property-fraud theory." *Ciminelli*, 143 S.Ct. at 1129. Indeed, the indictment alleges that the Defendants "conspired to defraud investors in the Silver Lease Program by . . . secretly misappropriating investors' money and silver" in order to obtain "money and property by means of false and fraudulent pretenses." *See, e.g.*, Doc. 2 ¶ 39. And the indictment set out in detail the *manner* in which the Defendants did so. *See id.* ¶¶ 1–39. Critically here, the indictment alleges the misappropriation of investor funds for "unrelated business ventures and [to] pay for the personal expenses of, among others, Johnson, Hook, and Johnson's wife." *Id.* ¶ 24. Under these circumstances, the Court concludes that the indictment is sufficient as to Counts One and Three.

The Court underscores that Defendants will have an opportunity to make arguments about their view of the facts—including the Government's purported misunderstandings regarding the Silver Lease Program Agreements—at trial; however, the Court may not, at this

juncture, dismiss Counts One and Three based on such arguments or characterizations of the allegations set out in the indictment. *See generally* Doc. 66 at 10–20.

### C. Severance

The Defendants move to sever their trials to "ensure access to the other's exculpatory testimony."[20]  Doc. 72 at 1.  Indeed, they "both seek vital, exculpatory testimony from each other to support their defenses," and they presently do not know whether they would do so at a joint trial.[21]  *Id.* at 2.  The Government argues that "[t]he Court should reject this argument and deny the [] motion because [the Defendants] have failed to demonstrate that severance is warranted under the multi-factor test adopted by the Second Circuit in *United States v. Finkelstein*, 526 F.2d 517 (2d Cir. 1975)."  Doc. 76 at 46.

Rule 14 of the Federal Rules of Criminal Procedure allows for severance where joinder of defendants "appears to prejudice a defendant . . . ."  Fed. R. Crim. P. 14(a).  The decision whether to grant a severance is "committed to the sound discretion of the trial judge."  *United*

---

[20] The Defendants outline three alternatives for severance.  Doc. 72 at 5.  They indicate that "the Court could (1) sever the defendants now to guarantee that each would be available at the other's separate trial; (2) proceed with a joint trial, and if either declines to testify (e.g., Johnson) for the other (e.g., Hook), it could sever the moving-defendant (Hook) so that the other defendant's ongoing trial (Johnson's) can conclude and thereafter render that defendant (Johnson) available to testify at a later, separate trial for the moving defendant (e.g., Hook); or (3) empanel two juries, conduct a joint trial of the government's case in chief before the two juries, and then allow the moving-defendant (e.g., Hook) to present the testimony of the other defendant (e.g., Johnson) before just the moving-defendant's jury (Hook's jury), while excluding from the courtroom the witness-defendant's jury (Johnson's jury).  Under this scenario, the closing arguments would be delivered to the juries separately (so the government would give separate closing arguments to each jury).  If neither defendant testifies or both testify, rendering the issue moot, one of the two juries could be excused and the trial proceed as any other."  Doc. 72 at 5.

[21] Johnson "has not decided whether he will take the stand in his own defense" and he "most assuredly would not testify[] if taking the witness stand would open the door to the admission of his prior federal fraud conviction."  Doc. 72 at 2.  However, the Defendants argue that "[a]t a separate trial—before a jury adjudicating Hook's guilt or innocence but not Johnson's—Johnson would unconditionally testify for Hook (his mother-in-law and grandmother to his children); his testimony would be exculpatory and support her defense that [two individuals] were the decision-makers regarding how PCI and NCB Wholesale Co. invested the money that 'lessors' . . . loaned PCI . . . and to whom she wrote checks and wire-transferred funds."  *Id.* at 2–3.  They add that "[o]n the flip-side, Johnson needs Hook's testimony" to counter the allegations set out in the indictment.  *Id.* at 3.  The Defendants argue that "severance is the only way" for Johnson to "vindicate his Fifth and Sixth Amendment rights to due process and compulsory process while not trespassing on Hooks Fifth Amendment right to remain silent at her own separate" trial."  *Id.* at 4.

*States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989). "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *United States v. Turoff*, 853 F.2d 1037, 1039 (2d Cir. 1988) ("[J]oint trials serve the public interest in economy, convenience, and the prompt trial of the accused"); *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993) (stating that the "principles that guide the district court's consideration of a motion for severance usually counsel denial"); *United States v. Lauersen,* No. 98 Cr. 1134 (WHP), 2000 WL 1677931, at *6 (S.D.N.Y. Nov. 8, 2000). "This preference is particularly strong where . . . the defendants are alleged to have participated in a common plan or scheme." *Salameh*, 152 F.3d at 115.

A defendant arguing that severance is appropriate, therefore, must demonstrate more than the danger of some prejudice, or a better chance at acquittal in a separate trial. *United States v. Torres*, 901 F.2d 205, 230 (2d Cir. 1990). Severance requires the defendant to demonstrate that he would be prejudiced so severely by the joinder that he would be denied a constitutionally fair trial, resulting in a miscarriage of justice. *Rosa*, 11 F.3d at 341; *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir. 1988); *Zafiro*, 506 U.S. at 539 (severance of defendants is warranted only where there "is a serious risk that a joint trial would compromise a specific trial right of a properly joined defendant or prevent the jury from making a reliable judgment about guilt or innocence" of one of the defendants). "[T]he fact that evidence may be admissible against one defendant but not another does not necessarily require a severance." *United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008) (quoting *United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983)). Even where there is a prejudice as a result of "disparity of proof . . . joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible." *United States v. Locascio*, 6 F.3d 924, 947 (2d Cir. 1993); *Carson*,

702 F.2d at 366–67 (concluding that differing levels of culpability among defendants insufficient to support severance).

The parties agree that the "test for severance in this Circuit based on one defendant's need for the testimony of a co-defendant is well-settled." Doc. 72 at 6. The Court considers the following factors: (1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his or her Fifth Amendment privilege; (2) the degree to which the exculpatory testimony would be cumulative; (3) the counter-arguments of judicial economy; and (4) the likelihood that the testimony would be subject to substantial, damaging impeachment. *United States v. Finkelstein*, 526 F.2d 517, 523–24 (2d Cir. 1976).

The Court denies the motion to sever at this time, without prejudice to renewal as the trial proceeds. Defendants concede that, currently, their motion "may be deemed somewhat premature according to the standards that govern severance." Doc. 72 at 1. Indeed, in regard to the first factor, they concede that they are unsure whether they would testify at their severed trials—although they do underscore that "[t]hey are family, so they are most likely to follow through on their commitment [to do so]." *Id.* at 7. But as the Government emphasizes, courts have typically "found the first factor to be satisfied [] when a co-defendant provides a sworn affidavit stating explicitly that he will waive his Fifth Amendment privilege against self-incrimination and testify at a severed trial of his co-defendant," or when there are other indicia allowing the Court to conclude as much. Doc. 76 at 47; *see, e.g.*, *United States v. DePalma*, 466 F. Supp. 920, 922 (S.D.N.Y. 1979); *United States v. Schlegel*, No. 06 Cr. 0550 (JS), 2009 WL 3837305, at *2 (S.D.N.Y. 2009). Because there is an insufficient showing—at this point in the

litigation—that the Defendants would in fact testify at their severed trials, and because of the strong interests in conducting one joint trial, the motion to sever is denied.[22]

### D.  Testimony of Andre Cardoso

The Defendants move the Court to authorize the presentation of live-closed-circuit ("CCTV") testimony of Andre Cardoso, a French citizen who resides in Paris, France.  Doc. 90 at 1.  In the alternative, they move to have Cardoso deposed pursuant to Rule 15 of the Federal Rules of Criminal Procedure.  *Id.*  In support of their motion, Defendants set out two main points; *first*, Cardoso is unable to travel to the United States due to a health condition that makes air travel medically unsafe for him; *second*, Cardoso, who previously served as an officer of PCI, has material testimony regarding the allegations in this case.  *Id.*; *see also* Doc. 100; Doc. 101.

The Government opposes the motion.  Doc. 95.  It argues that Defendants have failed to demonstrate the necessary "exceptional circumstances" required to warrant either remote testimony at trial or a Rule 15 deposition.  *Id.* at 3.  It further contends that Cardoso's testimony would be "entirely irrelevant, cumulative, or both," emphasizing that "Cardoso has submitted no affidavit with respect to his anticipated testimony, and the proffer of his expected testimony by defense counsel falls [well] short of the standard of materiality."  *Id.* at 3, 10.

### i.  Legal Standard

Rule 15 depositions may be employed when, due to exceptional circumstances, it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial.  Fed. R. Crim. P. 15(a)(1).  In order to succeed on a motion under Rule 15(a), a

---

[22] Since the Court concludes, at this point, that defendants have failed to make a sufficient showing that they would indeed testify in their severed trials, it does not address the remaining *Finkelstein* factors here.  *Finkelstein*, 526 F.2d at 523–24.

movant must show that:  (1) the prospective witness is unavailable[23] for trial, (2) the witness' testimony is material, and (3) the testimony is necessary to prevent a failure of justice.  *United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001).

As the Government points out, Rule 15 requires that such a deposition be taken and filed "in the same manner as a deposition in a civil action," and the "scope and manner of the deposition examination and cross-examination must be the same as would be allowed during trial."  Doc. 95 at 10; Fed. R. Crim. P. 15(e)(2).  Because of this, and the "considerable concern about the possible abuses of foreign methods of examining witnesses," foreign depositions are generally disfavored.  *United States v. Salim*, 855 F.2d 944, 950 (2d Cir. 1988); *see also United States v. Drogul*, 1 F.3d 1546, 1551 (11th Cir. 1993).

The standard for use of live CCTV testimony at trial is the same as that applied to a Rule 15 deposition:  (1) the witness must be unavailable, and (2) his testimony must be material to the case, and (3) the testimony is necessary to prevent a failure of justice.  *United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999); *United States v. Buck*, 217 F. Supp. 3d 619, 622 (S.D.N.Y. 2017); *see also* Fed. R. Crim. P. 15(a)(1).  The Second Circuit has made clear that testimony provided via CCTV "should not be considered a commonplace substitute for in-court testimony by a witness."  *Gigante*, 166 F.3d at 81.

### *ii.*  **Analysis**

The Court denies the Defendants' motion.  At this juncture, the Government does not dispute that Cardoso is unavailable due to a medical condition affecting his ear canal and limiting

---

[23] "Unavailability is defined by reference to Rule 804(a) of the Federal Rules of Evidence, which includes situations in which a witness 'is unable to be present or to testify at [a] hearing because of . . . physical or mental illness or infirmity."  *United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999) (citing Fed. R. Evid. 804(a)(4)).

his capacity to travel by air.[24]  Doc. 95 at 13; *see also* Doc. 90-2 (providing notes from medical provider).  Nevertheless, the Court concludes that Defendants have failed to meet their burden regarding the materiality and necessity of the testimony.  *Cohen*, 260 F.3d at 78.

Here, as set forth above, counsel for Defendants indicated that it would call Cardoso to testify that:  he did not believe that the PCI Agreements prohibited disbursements to fund unrelated business ventures, he approved such disbursements, and he intended to repay PCI lenders with anticipated revenues from those unrelated ventures.  Doc. 90 at 11.  However, as the Government points out, "Cardoso's subjective belief about what the Silver Lease Program Agreement[s] prohibit or [do] not prohibit is irrelevant to whether Jeffrey Johnson and Kathleen Hook engaged in a scheme to defraud."  Doc. 95 at 14 (noting that there is "no indication whatsoever that Cardoso advised the defendants on the meaning of the Silver Lease Program Agreements, or that he has admissible information regarding the defendants' views of what they could or could not do with investor money under the Agreements").

Additionally, as the Government also underscores, the fact that Cardoso and others approved the disbursements to unrelated business ventures is undisputed and otherwise provable through documentary records.  *Id.* at 16; *see* Doc. 2 ¶ 4 ("Unbeknownst to these investors, a substantial portion of these funds were misappropriated by [Johnson], and [Hook], . . . among others, to pay for, among other things, the personal expenses of Johnson, Johnson's wife, and Hook, as well as to fund other, unrelated business ventures . . . .").  Nor do Cardoso's intentions regarding repayments meet the materiality threshold here.  Indeed, as the Government points out, its case does not depend on "whether the defendants (much less whether Cardoso) intended,

---

[24] Nevertheless, the Court notes that travel may be safely possible by ship, despite the indication that Cardoso "would not be inclined to embark on the 10-day voyage."  Doc. 100 at 2.

hoped, or wished to make a profit" to pay the investors what they were owed, and, in any event, the law makes clear that "even a genuine belief by the defendants that everything would work out so that no investors would lose any money does not absolve the defendants of wrongdoing." Doc. 95 at 17–18 (citing *United States v. Lange*, 834 F.3d 58, 78–79 (2d Cir. 2016); *United States v. Coyne*, 4 F.3d 100, 113 (2d Cir. 1993)).

To be sure, the record suggests that Cardoso did, in fact, participate in PCI's business affairs and the disbursement of funds.  *See* Doc. 97 at 4, 5, 7.  However, Cardoso's "service as President of PCI was documented" and can otherwise be introduced by the Defendants.  *See generally id.*  All told, the Defendants' arguments regarding Cardoso's testimony are unavailing because they tend to show that his testimony fails to meet the materiality requirements or is otherwise cumulative.  *See generally* Doc. 90; Doc. 97.

Finally, the Court highlights the significant delays that would be caused by the Defendants' requests here.  As set forth above, the Department of Justice has indicated that both a deposition and CCTV testimony would require consent and assistance from the French government pursuant to letters rogatory—a process that the Government asserts could take more than one year.  Doc. 95 at 8–9.  Given the limited relevance of the proposed testimony, such a delay is not in the interest of justice in this case.  *Gigante*, 166 F.3d at 81.

Here, the Court simply cannot conclude that the "exceptional circumstances" requirement of Rule 15 have been met.  Fed. R. Crim. P. 15(a).  Accordingly, it denies the Defendants' motion to present Cardoso's testimony via live CCTV or a Rule 15 deposition.[25]

---

[25] The Court notes that the Defendants have stated that they prefer for Cardoso testify in-person, Doc. 97 at 10, and it underscores that Defendants' requests for a continuance in this regard have been granted on several occasions, *see* Min. Entry dated Feb. 21, 2023; Min. Entry dated June 8, 2023.  As of June 2, 2023, counsel for Defendants indicated that "Cardoso expects additional surgery will likely proceed in August 2023," and his next appointment was scheduled for July 11, 2023.  Doc. 101 at 1–2.  While "Cardoso remains unwilling to travel overseas while the

### E.  Johnson's Prior Conviction

Defendants move to preclude the Government from admitting Johnson's 2012 federal conviction for bank fraud and related offenses.[26]  Doc. 85.  The Government argues that evidence of Johnson's prior conviction is admissible as direct evidence of the charged conspiracy, or, in the alternative, it may be admitted under Rule 404(b) of the Federal Rules of Evidence.  Doc. 89 at 13–19.  It also asserts that Johnson's plea allocution and the judgment of conviction itself are also admissible as direct evidence of the charged conspiracy.  Doc. 89 at 19–20.

### i.  Legal Standard

Rule 404(b) of the Federal Rules of Evidence provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[27]  Fed. R. Evid. 404(b).  "The Second Circuit evaluates Rule 404(b) evidence under an 'inclusionary approach' and allows evidence 'for any purpose other than to show a defendant's criminal propensity.'"  *United States v. Garcia*, 291 F.3d 127, 136 (2d Cir. 2002) (quoting *United States v. Pitre*, 960 F.2d 1112, 1118 (2d Cir. 1992)).  Under the Second Circuit's "inclusionary approach," courts "admit evidence of prior bad acts if the evidence 'is relevant to an issue at trial other than the defendant's character,

---

medical situation persists," the Court notes that the trial is currently scheduled for approximately three months after Cardoso's August procedure.  *See* Min. Entry dated June 8, 2023 (adjourning trial to November 6, 2023).

[26] The Government's motions *in limine* include arguments regarding why evidence of Johnson's prior conviction is admissible.  Doc. 89 at 9–20.  The Court considers the arguments from both parties here.

[27] The Second Circuit has held that "evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial."  *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997) (internal quotation marks omitted)).

and if the probative value of the evidence is not substantially outweighed by the risk of unfair prejudice.'" *Id.* (quoting *United States v. Tubol*, 191 F.3d 88, 95 (2d Cir. 1999)).  Specifically, the Supreme Court and Second Circuit have distilled the admissibility inquiry under Rule 404(b) to a four-part test:  (1) the prior act evidence was offered for a proper purpose; (2) the evidence was relevant to a disputed issue; (3) the probative value of the prior act evidence substantially outweighed the danger of its unfair prejudice; and (4) the court administered an appropriate limiting instruction.  *Id.* (citing *Huddleston v. United States*, 485 U.S. 681, 691–92 (1988)).

Importantly, the inclusionary approach "does not invite the government 'to offer, carte blanche, any prior act of the defendant in the same category of crime.'" *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009) (quoting *Garcia*, 291 F.3d at 137).  Where "such evidence is offered for the purpose of establishing the defendant's knowledge or intent, we require that the government 'identify a similarity or connection between the two acts that makes the prior act relevant to establishing knowledge of the current act.'" *Id.* at 475 (quoting *Garcia*, 291 F.3d at 137).

### *ii.* Analysis

The Government contends that Johnson's prior conviction is "inextricably" tied to—and direct evidence of—the instant offenses. Doc. 89 at 14.  It underscores that, although that conviction "occurred several years before the charged conspiracy here, Johnson's subsequent conduct in the charged conspiracy" is explained, at least in part, by the fact that he had the conviction on his record.  *Id.* at 14–15.  And it points out, for example, that witnesses will testify that "Johnson specifically referenced his prior federal conviction as one of the reasons why he should not be listed on any documentation related to PCI, NCB Wholesale, or the Silver Lease Program more broadly."  *Id.* at 15.  In other words, "Johnson's prior conviction[ is] a key part of

the story of how the Silver Lease Program fraud was structured and carried out and a key part of the evidence of the formation of the conspiracy." *Id.*

The Government cites to *United States v. Rosemond*, 958 F.3d 111, 125 (2d Cir. 2020) in support of its argument. *Id.* In that case, defendant-appellant Rosemond was charged with several murder-for-hire charges, and the trial court admitted "prior bad-act evidence of several violent incidents between [Rosemond's music management company and a rival record label] that were in connection with, and led to, the murder-for-hire conspiracy" at issue, as well as "evidence of uncharged narcotics trafficking acts." *Rosemond*, 958 F.3d at 115, 125. On appeal, the panel concluded that the evidence was properly admitted pursuant to Rule 404(b) for a number of reasons. *See id.* at 125. First, the prior bad acts "provided the jury with context to understand why Rosemond paid to have [the victim] killed" and "provided background to show that Rosemond sold narcotics, which demonstrated his ability to make payments – in support of an element the government was required to prove," *id.*; second, they explained "the mutual trust between Rosemond and other conspirators," *id.* at 126; and third, "Rosemond was charged with murder-for-hire, which is far more sensational and disturbing than the conduct admitted as prior bad acts," *id.* The Government argues that Johnson's prior conviction is similarly admissible here, given that it explains why Johnson avoided being listed in Silver Lease Program materials and concealed his involvement from investors. Doc. 89 at 15. It asserts that it "expects to establish that Johnson secretly controlled PCI and NCB Wholesale and installed individuals under his direction and control as the nominal managers of those entities," and, accordingly, "his prior criminal record is both a material omission to investors in itself, and direct evidence of his intent to defraud the victims of the Silver Lease Program." *Id.*

34

The Government further contends that evidence regarding Johnson's prior conviction is admissible because that evidence establishes "knowledge, intent, and absence of mistake or accident."  Doc. 89 at 16.  In this regard, it asserts that "Johnson's prior conviction, which involved [him] knowingly defrauding a financial institution and the IRS, tends to refute his argument that he lacked the intent to engage in fraud and/or lacked any knowledge of fraudulent activity."  *Id.*  It further asserts that the probative value of the evidence is not outweighed by a danger of unfair prejudice or confusion because it is "no more inflammatory, sensational, or disturbing than the charged offenses."  *Id.* at 18.

The Court denies Defendants' motion to exclude Johnson's prior federal conviction and concludes that evidence of the conviction is admissible under Rule 404(b).  Indeed, given the alleged structure of the Silver Lease Program, PCI, and other corresponding entities, the prior conviction is probative of Johnson's intent, knowledge, absence of mistake here.  Fed. R. Evid. 404(b).  And, as in *Rosemond*, the prior conviction is no more sensational than the instant offenses.  *Rosemond*, 958 F.3d at 126.  The Court acknowledges, however, the risks pertaining to impermissible propensity inferences outlined by the Defendants.  Doc. 85 at 2.  Accordingly, it will offer a limiting instruction indicating that the jury may only consider the evidence with respect to the issues of intent, knowledge, and absence of mistake.  *Id.*; *see also* Doc. 89 at 18–19.

Finally, in regard to the admission of Johnson's plea allocution and judgment of conviction, the Court defers adjudication of the Government's request to the final pretrial conference.  While the Government argues that "those materials provide critical information regarding Johnson's decision to conceal his role, and indeed existence, from victim investors in the fraudulent scheme charged here," Doc. 89 at 19, it has also indicated that its witnesses will

testify in support of the same points, *id.* at 15.  Given these circumstances and the potential

prejudice involved with the admission of these documents, the Court reserves ruling on the

motion until the parties have further prepared their cases and are able to argue their positions

prior to trial.  *See id.* at 19; Fed. R. Evid. 403 ("The Court may exclude relevant evidence if its

probative value is substantially outweighed by a danger of one or more of the following:  unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly

presenting cumulative evidence.").

### F.  Remaining Government Motion *in Limine*

The Government moved to preclude cross-examination of a cooperating witness with

respect to two aspects of his background:  a 2009 arrest that resulted in charges that were

subsequently dismissed, Doc. 89 at 20, and several instances of payment for prostitution, *id.* at

21.

The Court defers adjudication of this request at this time.

### G.  Subpoenas

On February 6, 2023, Defendants requested that the Court order several witnesses to

comply with subpoenas *duces tecum* pursuant to Federal Rule of Criminal Procedure 17(c).  Doc.

83.  The motion asked the Court to require certain witnesses to comply with the subpoenas by

February 27, 2023, seven days before the then-scheduled trial date, March 6, 2023.  *Id.*

Rule 17 of the Federal Rules of Criminal Procedure allows a party to subpoena

documents for use as evidence at trial.  Fed. R. Crim. P. 17.  Rule 17(c) "allows parties to

subpoena any books, papers, documents, data, or other objects the subpoena designates."  *United*

*States v. Seabrook*, No. 16 Cr. 467 (ALC), 2017 WL 4838311, at *1 (S.D.N.Y. Oct. 23, 2017).

"Notably, [Rule 17] is not a method of discovery that supplements Rule 16."  *United States v.*

*Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, at *11 (S.D.N.Y. Oct. 9, 2020) (citing *United States v. Nixon*, 418 U.S. 683, 698 (1974)).

"On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive."  Fed. R. Crim. P. 17 (c)(2).  "When a party moves to quash the subpoena[ ] as unduly 'unreasonable or oppressive,'" the proponent of the subpoena must make a preponderance showing that the materials requested satisfy the standard under Rule 17.  *See Seabrook*, 2017 WL 4838311, at *1 (quoting Fed. R. Crim. P. 17(c)(2)).  Generally, the party requesting a subpoena has the burden of showing the following:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

*Nixon*, 418 U.S. at 699–700 (footnote omitted).  More succinctly, "the party seeking issuance of the subpoena 'must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity.'" *Blakstad*, 2020 WL 5992347, at *11 (quoting *Nixon*, 418 U.S. at 700).

Here, the Defendants filed draft subpoenas to be issued to six different parties.  *See* Docs. 83-1, 83-2, 83-3, 83-4, 83-5, 83-6.  Neither the Government nor the parties at issue appear to challenge the subpoenas, and the Court is inclined to issue an order requiring compliance. However, several circumstances have changed since the time that the Defendants' motion was filed.  First, the Government indicated that it elected not to proceed to trial on Counts Two and Four of the indictment.  Doc. 88.  Second, the trial has been twice adjourned.  *See* Min. Entry dated Feb. 21, 2023; Min. Entry dated June 8, 2023.  Accordingly, the Court defers adjudication of the motion at this time.

## III.     CONCLUSION

For the foregoing reasons, Johnson and Hook's motion to dismiss Counts Two and Four is DISMISSED as moot; their motions to suppress evidence and to dismiss Counts One and Three of the indictment are DENIED; and their motion to sever is DENIED without prejudice to re-file at a later time.  Additionally, the Defendants' motion to present the testimony of Andre Cardoso, a witness, via live CCTV or through a Rule 15 deposition is DENIED, as is the Defendants' motion to exclude Johnson's prior conviction.

Finally, the Government's motion *in limine* to preclude cross-examination of its cooperating witness is deferred; and the Defendants' motion to produce subpoenaed documents is also deferred.

The Clerk of Court is respectfully directed to terminate the following motions:  Docs. 64, 65, 66, 67, 72, 83, 85, 89, 90, and 100.

IT IS SO ORDERED.

Dated:     August 31, 2023
           New York, New York

_____
           EDGARDO RAMOS, U.S.D.J.